Good afternoon and may it please the court. My name is Leah Nichols and I represent the appellants Leonard Cottrell et al. and I'd like to reserve three minutes for rebuttal. That'll be granted. Plaintiffs have Article 3 standing to bring their consumer claims against defendants. Plaintiffs are purchasers of defendant's prescription eye drops and defendant's illegal conduct cause large portions of that medication to be unusable and wasted. Here the injury is the money that plaintiffs have already spent on medication that they were unable to use. This pocketbook injury is a paradigmatic injury in fact and it gives rise to Article 3 standing here. Is this just a case about package efficiency? Your Honor, it's a case about an unfair business practice. So here the Article 3 injury is the fact that the consumer purchased medication. And we're not talking about a few extra drops of medication here, Your Honor. We're talking about the fact that half the bottle of medication or two-thirds of the bottle of the medication was unusable. And that, the fact that they had to spend money on that is what gives rise to Article 3 standing. Now it's a separate question about whether they've stated a claim under state consumer law in this context. So even though a consumer might have Article 3 standing to bring a claim, they still have to meet that standard. So when we're talking about... When I get a prescription for eye drops and the doctor says take two drops twice a day for 10 days and I always expect at the end of the 10 days that there is going to be a quantity left in the bottle. That doesn't bother me. If I get conjunctivitis again, I'll probably use it up without a doctor's prescription. That's beside the point. But the fact that I get a little bit more than what is necessary for the number of drops prescribed has never seemed to me to be a problem. You couldn't... If it was just the number of drops prescribed, you couldn't get the last drop out of the bottle. And when I miss my eye putting an eye drop in, I'd be up the creek. So what's the problem with having some left over? Your Honor, several responses to that. First, having a little bit left over may still very well be an Article 3 injury, but it probably doesn't state a claim under state law. So I think we're sort of normatively uncomfortable with that kind of claim going forward. But it doesn't go forward not because there's no Article 3 standing, but because that would fail to state a claim under state law. The second thing I'd like to say in response is that these are different types of eye drops than the ones to which you refer, Your Honor. These are drops that the plaintiffs are forced to take every day for the rest of their lives. So it's not as if they get it and then it runs its course. They're going to keep purchasing bottles of this medication forever or until the end of their lives to avoid blindness. Do the plaintiffs have a choice of, I guess, the size of the drop? I saw your charts and apparently all of the ones you list there are over what is necessary. Are there ones within? No. Okay. No, there are not, Your Honor. All of the drops available, all the glaucoma drops available on the market today are all, again, two to three or more times the size that the scientific community has unanimously recommended for consumers. What we do know is that where is that the relative size, and I think this goes to some of the concerns about the standing here, the relative size of the drop. So right now there are drops, say, 35 microliters versus 40 microliters, is a driver of the cost of treatment to the consumer. So there are two studies I'd like to particularly draw attention to. Is the relief you're seeking money or is the relief you're seeking an adjustment to the delivery mechanism? Both, Your Honor. Those are both requested relief. With respect to the latter, the delivery mechanism, is the district court equipped to order such relief? We believe it is, Your Honor, and I think your question is getting at the question about whether there would be FDA preapproval required. That is the dispositive question in the preemption issue. However, what we've pled in the complaint. Which we're not going to talk about. Which we're not going to talk about. However, we've pled in the complaint that this is a change that is feasible for the defendants to have made. And the reason that we know that is that the defendants have, in fact, changed their droppers and have changed the size of the drop over time, and there is no public record that they sought or got FDA preapproval for any of those changes. How are you going to quantify the money damages in this case? So we would quantify the money damages by taking the amount of money that each class member spent on the medication and prorating that according to how much larger than 16 microliters the drops were. So, for example, if the drops were 32 microliters, then we would propose that the consumers would be entitled to half their money back. Now, we haven't reached that stage in this litigation yet. I mean, I think it's important to note that this is a pure motion to dismiss only on the face of the complaint. There's been no evidence entered with regard to this issue, and standing is, of course, something that can always be revisited as more things come out. Can I ask you a question? I don't think it's answered by the briefs, but there was some talk about adverse health effects from having too much medication. Are you saying that, in fact, people were injured, or is this just a mention? I'm not sure it was actually connected to actual injury. Your Honor, we have alleged that it does increase the risk of injury. It does that for everyone, and we argued in our reply brief that that's another basis for standing. What hasn't been alleged is any of that. So you're seeking relief for that as well? Yes. Any adverse health effects? Right. The increased risk of adverse health effects. How do you still assume it's true? None of the plaintiffs have suffered an adverse health effect. Is that correct? We have not alleged that. That's correct. But, again, this is something that the plaintiffs will be taking going forward, and it does. The excess medication does increase the risk of side effects. So defense counsel is going to cite Finkelman and suggest that you're the speculator at best. How do you distinguish your situation from the plaintiffs in Finkelman? Sure, Your Honor. There are a number of ways in which it's distinguishable, but I'm going to focus on one, and that's that in Finkelman the plaintiff had failed to allege plausible facts showing that the NFL's alleged withholding of Super Bowl tickets would, in fact, contract the supply on the secondary market. There was no allegations to support that. The court did, this court did give credence to his basic economic theory, which was that if there was a reduced supply, the cost will go up. But it said Finkelman hadn't pled that. Here, what's at issue is whether or not the fact that if the drops were smaller, the consumers would have to spend less money. We think that that is adequately, or it is adequately pled here. One of the reasons it is is because at least two of the studies actually ask the question, how much is the cost of treatment of relative drugs, and is that driven by the drop size? In particular, that says the FDA, does the FDA in any ways regulate the size of a drop or prescribe how big a drop should be? No, Your Honor, it does not. That goes primarily to the preemption question, but as you'll see in the preemption argument, in none of the approvals for any of these drugs of which we're aware that's available in the public record, does the FDA regulate the size of the drop? No. When the doctor has prescribed the medication in these cases, has the doctor given a prescription which covers a number of drops over a certain period of time or simply said use this until it runs out? Again, Your Honor, in this case, these are drugs that the person will presumably take forever. But the doctor prescribes, and when the doctor prescribes to the doctor, say, all right, for the next 30 days, take two drops twice a day, and then a new prescription will issue in 30 days after that. Right, I think that's how it would work, Your Honor, but there's no information in the complaint with regard to that. So going back to the question about, you know, does the drop size drive the cost of the medication in the course of treatment? The answer is yes. The Hardenbaum study, which was sponsored by Merck, and the Ventura study, both of which are discussed in the complaint, actually looked at this question, you know, what drives the cost of treatment for consumers, and they concluded that standing here today, and this is not speculation, this is not, you know, an assumption, they said standing here today, drugs that come in smaller drops are cheaper to consumers over the course of treatment. And again, that's a conclusion that a Merck study found, and that's on top of all the other articles. What if they actually just increased the price of the fluid? Your Honor, the fact that certainly I don't think that affects standing, and here's why. A defendant, or I guess I shouldn't say defendant, a manufacturer always has price discretion to increase or decrease the cost of whatever their product is. That doesn't defeat the fact that plaintiffs here, and this is their injury, that plaintiffs here have already spent the money on wasted products. It doesn't obviate that. And similarly, if we compare this to, this is an unfairness claim, so it's a little bit different than I think many other claims, although supported by the law. If you have, say, a deception claim or a defective product claim, and the consumer says, well, my injury is the difference between, you know, what I thought I was getting and what I got. The defense that the manufacturer could have raised the prices or charged a different price would obviate injury in all of those cases. And so to say that that changes the fact that the consumer has already spent the money on medication and they were forced to waste doesn't, the fact that they could have charged something else doesn't change that. We have to look at each type of relief that you request. It seems to me, using Judge Estrepo's hypothetical, I mean, on a going forward basis, maybe equitable relief, if the other side skyrocketed their prices to compensate for whatever, you know, to make sure their profit's maintained, would there be injury in fact to support equitable relief? So I want to make sure I understand your question. So you're saying if they... We have to look at each of the types of relief, I think, to see where they're standing. Sure. But, I mean, the fact that the laboratories can raise their prices any way they like, I mean, there may not be any actual injury. Would there be if they did that? I know that's hypothetical. Yes. Again, that doesn't obviate the fact that they have standing with regard to the damages. As far as going forward, I think the equitable relief, I think there would be injury whether or not they raise their prices if they were still forced to purchase medication they couldn't use. And so that's really, that's the heart of the injury here. Whether we're talking about, you know, future or what's already happened, the heart of the injury is that they're forced to buy that medication that they can't use. And that fits squarely within the unfairness standard under that the FTC has put out, right? There has to be a substantial injury to consumers that isn't reasonably avoidable by the consumers themselves and isn't outweighed by any countervailing benefits. And for the reason... But don't they use up the bottle of the medication before they buy a new bottle? May I answer? Yes, you may. Okay. Judge Roth, the answer is yes, but each drop, each time they use a drop, half or more of that drop is wasted. So it doesn't matter whether they get to the bottom of the bottle or not. Even if they get to the bottom of the bottle, throughout the course of using it, the consumer has been forced to throw away, essentially, or rolls down their cheek or into their bloodstream, throw away half or more of each drop of that medication. So how much is left in the bottle isn't relevant to the particular claims here. Okay. Judge Roth, do you have anything else? Because your time is up. No, I don't. Okay. Thank you, counsel. Thank you. Good afternoon. May it please the Court. My name is Robin Blado. I represent Pfizer, and I'll be arguing on behalf of the appellees. This case is a perfect example of where Article III courts should draw the jurisdictional line. The products worked exactly as they were supposed to. The plaintiffs weren't lied to in any way. They weren't physically or emotionally injured in any way. In fact, they admit that they got what they paid for. They say that on purpose. But they're arguing to us that the product didn't work effectively and that the delivery mechanism was too generous, so to speak. Actually, they haven't argued that the product didn't work effectively in any way, shape, or form. They have argued that the product worked perfectly effectively. That the delivery mechanism caused waste. That the delivery mechanism, according to them, could have been improved. I mean, the argument here is that the product could have been improved, that it could have been made more efficient. They argue that they believe they've come up with a better way to make these FDA-approved products. Well, that's not Article III standing. That's not injury in fact, not under the jurisprudence of this court and the United States Supreme Court, or even under the ordinary meaning of the words injury. But if you interpret their argument to suggest that they paid for medication they couldn't use, you don't see any monetary damages there? That they paid for medication that they couldn't use? I mean, they weren't forced to pay for anything. I mean, I think what they've done is they've tried to fit this case into a situation where they've been forced to pay for something that they've wasted. Well, the statutes they seem to be suing under rely on this FTC unfairness statement which talks about sellers being coerced into purchasing unwanted goods or services. I mean, wouldn't this be forced into purchasing unwanted, you know, drops that roll down your cheeks or otherwise go into your bloodstream? Well, absolutely not because they're purchasing treatment. I mean, they're purchasing treatment for their ailments. And as Judge Roth noted or questioned, this is really a packaging efficiency issue. They're getting the treatment that they want and they're getting every drop that they need and they're not running out of drops before their prescriptions are up. There's no actual injury. The fact that they might have gotten more than they used is not an injury within any ordinary sense of the word or injury, in fact, under Article III. I mean, if it were, then a consumer could literally walk down the grocery aisles and pick any product that was overpackaged in some way. I mean, you could argue that plenty of products are inefficient in some way or could be improved. You could argue that a car should be. But the consumer doesn't have to buy the big jug of peanut butter or doesn't have to order the large fries. These folks had to get their treatment, right? Well, sure, they had to get their treatment and they did get their treatment. But just because plaintiffs have chosen to sue a group of defendants in one court does not mean that these defendants are acting collectively to control the marketplace in any way. They haven't articulated any or alleged any sort of conspiracy or collective action or anything like that. What they're trying to do is hold each individual defendant responsible for what the marketplace looks like. And the marketplace has these FDA-approved drugs that work exactly as they're supposed to. If they could be improved in some way, as plaintiffs allege, then plaintiffs are simply welcome to pitch that idea to the market. But you can't hold these defendants responsible just because these are site-saving drugs that these drugs are needed in order to... So what about, I think, an interesting hypothetical is the one in the briefs about pumping gas. Let's say you think you're buying $2.50 worth of gas, but half of it ends up on the ground. Isn't that a problem? Of course that's a problem in the context of gas because you're actually paying for volume of gas. Here, you're paying for treatment. You're paying for a certain number of doses. You're also paying for a volume of medication that comes in the bottle. And the plaintiffs are saying if the drops were smaller, we could buy a smaller volume to cover the treatment that is prescribed in this course of treatment. And isn't that the fact that they could buy a smaller amount at a lesser cost and end a financial and economic injury that they're suffering? It would be if it wasn't entirely speculative. I mean, this product does not exist. This product hasn't been designed, tested, manufactured, approved by the FDA. This product is something that they believe should exist in the marketplace, but it doesn't. So just as a court can't assume that plaintiffs are going to save money if a hypothetical product someday comes into existence, it also can't assume that plaintiffs have wasted money because the hypothetical product wasn't used in the first place. Here, sure, they purchased a volume of medication, but they purchased that volume in order to treat their ailment for a certain period of time. They haven't alleged anywhere that they ever ran out of medication before they needed to refill their prescription. But again, isn't this kind of a consumer coercion type case, under our Danvers case and the FTC unfairness statement, that they're being coerced into buying more than they really need? I definitely do not believe it's a coercion case at all. I mean, the Danvers case is a perfect example. Danvers is a situation where Ford was actually taking 1 percent off every sale of a vehicle from the Ford dealerships. It was taking money in order to force dealers to participate in this certification program that nobody wanted to participate in. Every time they sold a car, they were being forced to pay 1 percent. Here, these plaintiffs have been using this medication. They willingly entered into these transactions for years, potentially even decades. And now after the fact, they've come up with a way that they could potentially be improved, and they want to say that they were forced. I mean, kind of using what you're saying, I mean, of each drop, they're only using 50 percent. The other 50 percent goes to waste, and yet they have to use it, don't they? I mean, that may or may not be. I mean, you're dropping and dropping. You might get some under your skin. Somebody gets injured. I mean, all of this is speculation. All of this is speculation, because you have to assume that there's some other product out there that would have been cheaper in order to come up with some pricing differential. I mean, you have to assume that if defendants had not engaged in this, whatever this allegedly unlawful act is, using standard FDA-approved dropper tips, that there would have been some dropper tip that was put on there instead that would have saved the plaintiffs money so that they could use the product for even longer. That's their argument. That's just not, that's complete speculation. Have any of the other cases, I know there's several cases similar to this one, been dismissed on standing? There have been, well, there were two cases in the Eastern District of Missouri that were dismissed on injury under the state consumer protection laws. I don't think the argument was made. The Article III standing argument was not made. The Ikey case in Illinois is now before the Seventh Circuit, and the standing issue is before the Seventh Circuit. The Gustafson case is in the District of Massachusetts. We don't have a final order on that one yet, but the court did indicate orally on the record. He was not going to dismiss it on standing. Where is the Seventh Circuit case procedurally right now? A class was certified in that case, and we petitioned for review under 26F, and the Seventh Circuit granted it. Okay. And the standing issue has now been raised again with the Seventh Circuit. Was the standing issue raised in the district court? We raised the injury issue in the district court, and we did cite Article III in our motion to dismiss, but the court did not rule on the Article III issue at all. So we believe and we anticipate and believe that, as this court should, the Seventh Circuit will also address the standing issue and dismiss on those grounds. You'll keep us advised about that, right? We sure will. Okay. We sure will. I just want to note one thing. The adverse health effects, that wasn't part of their issue presented. That wasn't part of their opening brief. They brought that up on our client. I wonder if it even alleges an injury in fact. Well, it certainly does not. There is not a single plaintiff who alleges that there have been any adverse health effects at all. And there is actually not a single allegation that anyone out there, anywhere, has suffered any adverse health effects associated with the larger drops. I think it was made clear they were pursuing two claims, one based on monetary damages, and one of them was not an injury, a physical injury claim. Correct. There's just a money claim. And to refer back to Finkelman, the distinctions that were attempted to be drawn in Finkelman just don't apply here. In Finkelman, there was the same issue. And, in fact, I think we have an even stronger case that there was no standing here than there was in Finkelman. In Finkelman, the court ruled that the NFL withheld the tickets and there's no way of knowing what the resale ticket, what the resale market would have looked like had the NFL not engaged in that practice. At those places, Finkelman, one plaintiff didn't participate at all, didn't pursue a ticket, and the other one didn't pursue it in the secondary market. Correct. Correct. So those were issues as well. But the court held that the inherent speculative nature of what the market would have looked like had the NFL not withheld the 99% of Super Bowl tickets, that's what they based their opinion on and why there was no injury in fact. Here, we don't even have a Super Bowl market to look at or for an expert to opine on. What we have here is a product that does not even exist. So there's nothing that anyone could do to try to figure out what that market would look like because the product does not exist. If there is no alternative product, the plaintiffs have asked for an injunction. Can we order an alternative product? Of course not, Judge Roth. That absolutely cannot be ordered by any court because there's a preemption issue obviously there. You can't order a company to manufacture a product that would then also have to be approved by the FDA before it even came to market. I mean, I'm not aware of any case ever ordering any company to manufacture a product. I mean, that's the inherent problem with this case. These products exist. They've been working for decades. Plaintiffs have been using them. They work perfectly fine for plaintiffs. They're getting the treatment that they need. They're getting every dose that they need. There hasn't been any sort of misrepresentation associated with the product purchases, and yet they still want some of their money back. I mean, my colleague here has argued that as long as they paid money in the past and now they're asking for some of it back, that that's enough to state a claim for standing. Well, of course that's not true. You have to have a cognizable legal theory to support your standing, and I think Judge Wolfson did a really good job in her opinion of articulating the various different types of standing theories of injury theories that one might use in order to actually have standing in a case like this. So she said, you know, if plaintiffs were promised a certain number of doses or drops and didn't get them, if they were forced to purchase additional prescriptions because they prematurely ran out, if the eye drops didn't perform as intended. I mean, these are all cognizable theories of injury. The theory that plaintiffs are proposing here is it's a packaging inefficiency. It's that the product could be packaged better. As I said before, we could do that. I mean, I can't even imagine how the floodgates would open in that case. We even raised the issue of we argued that this is no different than someone suing over the last few drops of the ketchup bottle or toothpaste in the tube. You know, cars could be made more fuel efficient. Paper towels could be more absorbent. The list goes on. Plaintiffs' response to that is that there would actually be Article III standing in those cases. Now, if that's not a red flag to federal courts, as it was to the district court below, then Article III is not functioning as it should. This is really a slippery, a very, very slippery slope. I think if there are no further questions, I can wrap up. I think this is a case that – oh, actually, I would – you have another question. Okay, go ahead. In the Seventh Circuit, where are they? Has it been fully briefed? Has it been argued? Oral argument is February 7th. February 7th, okay. Yeah, so it's on a similar timeline as this one. You know, as the Supreme Court – Do you get to argue? I'm actually going to – my colleague, Mr. Oswald, is going to argue. You're doing a good job, so – Okay, great. You know, I just closed with a Spokane quote because I think that's important. As the Supreme Court recently stated, no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies. This is the farthest thing from an actual case or controversy. This is a made-up lawsuit over FDA-approved products that worked exactly as they were supposed to for years, and in some cases decades, and this court should not exercise Article III jurisdiction over this case. Judge Roth, do you have anything else? No, I don't. Thank you, counsel. No, I don't. Thank you. Why don't you start with the slippery slip? Counsel just suggested that you would agree that the paper towels, the ketchup all on that would lend itself to Article III standing. Do you agree? Yes, and here's – and let me explain. This is actually exactly where I was going to start. What this court has said, and I'm going to quote, is that all you have to do – it says, for the purposes of a motion to dismiss, quote, the contours of the injury in fact requirement, while not precisely defined, are very generous, requiring only that claimants allege some specific identifiable trifle of an injury. That's what this court has said with regard to standing. Now on those cases, now it's interesting because you're talking about the last few drops of ketchup. What happens when it's half the bottle, which is more like this case? Then, you know, it starts to look like there's something there. But standing is an on-off switch. It's not, you know, you're not more injured or less injured for Article III standing purposes. You're either injured or you're not. What takes care of the slippery slope is whether or not the plaintiffs have stated a claim. This court asked about what was going on in the other cases. Have, in similar cases, have standing been addressed? The answer is no, other than in the Gustafson case in Massachusetts, the answer is no, because those cases involved whether the plaintiffs had stated a claim under state law. State law addresses these questions and deals with it. So, for example, under the New Jersey law in which we sue, there must be, you can't sue over the last couple of drops in the ketchup bottle, but you can sue over half, you know, over when it's half the ketchup bottle. That's a decision and that's what keeps, it's those, that failure to state a claim is what keeps those cases from going forward. You've laid out a pretty clear legal principle. Yes. It's not so easily applied, though. What's the difference between a little and a half? Where do we draw a line? We have to draw it right in opinion here. Right. Well, that's the difference. Well, again, that's a question not of Article III standing, but a question of whether the plaintiffs have stated a claim under state law, which is a question that the district court has not reached yet in this case. So we actually, you don't have to answer that question here. That's on remand a question that the district court would address. The defendants here filed a motion to dismiss for standing and for failure to state a claim and on preemption grounds. So presumably the district court would move on to the failure to state a claim and the preemption grounds on remand. So, again, that's a question, that's a question of state law, is what kind of claims can you bring, or federal law in the context of a federal statute. It's those substantive laws that take care of those slippery slope arguments and take care of the concerns about those claims that were uncomfortable going forward. Again, the claim here requires substantial injury, so it has to be substantial. Many state claims have a materiality aspect to them, and it requires not to be reasonably avoidable by consumers. So when we're talking about ketchup bottles and paper towels and all of those things, those are claims that are not going to go forward, but they're not because of a standing issue because they failed to state a claim. What are the speculative nature of your claim as framed by counsel in that the better delivery system doesn't exist? We're just speculating here. So here, this is a case in which it's absolutely feasible for defendants to have already done this, and it's not speculative that they do this. Defendant Alcon, for example, developed a 16-microliter dropper, tested it on patients, it did very well, and then decided not to use it. And there are dropper designs that have been published. So all of this idea that this dropper or whatnot doesn't exist simply isn't factually correct. Those designs are out there. They've been tested by some of the defendants already. And so this isn't a case where it's purely theoretical. This is a case where it's already been tested and looked at. You know, in looking over Judge Wolfson's opinion, she seemed to have criticized your replacement cost theory. And is that a criticism of an injury in fact or traceability defect, or is that a redressability issue? I see I'm out of time. I want to make sure I'm getting at the right part of Judge Wolfson's opinion. This is when the court is talking about the replacement cost theory. She wasn't impressed. Was she really talking about redressability? Possibly, or causation. I think those are some other aspects, but not injury. What appeared to be the focus of Judge Wolfson's decision was the criticism that the plaintiffs hadn't pled deception and hadn't pled defective product and so on. But that just goes to the substantive nature of the claims. It doesn't go to whether there's an injury here or not. Are there any further questions? Judge Roth? Anything more? No. Okay. Thank you very much, counsel. Thank you. This is a fascinating case. Thank you, counsel, for the excellent briefing and argument. We'll take the case under advisement. And if counsel are willing, Judge Restrepo and I would like to meet counsel at Sidebar and congratulate you more personally and thank you more personally. So if we go off the record for a minute, and we'll come back.